UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

                                                    :
JASON POWLETTE, *et al.*,                           :
                                                    :
                                      Plaintiffs,   :
                                                    :
                        v.                          :
                                                    :
CHERYL MORRIS, *Director of Ministerial,*           :
*Family and Volunteer Services,*                    :
                                                    :
                                      Defendant.    :
                                                    :
------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 23, 2016
```

13 Civ. 7378 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

This case addresses the delicate balance that must be struck between the ability of inmates in the New York State Department of Corrections and Community Supervision ("DOCCS") to practice their religion and the equally important ability of prison officials to promote legitimate penological interests. Plaintiffs Jason Powlette and Karvia Hamilton, practicing Rastafarians, filed a civil rights action claiming, among other things, that alterations to DOCCS's annual Religious Calendar for the year 2013 (i) impaired their constitutional right to the free exercise of their religious beliefs; (ii) violated the Establishment Clause of the First Amendment; and (iii) violated the Equal Protection Clause of the Fourteenth Amendment. Defendant Cheryl Morris concedes the alterations, but claims that they were undertaken as a result of valid penological concerns, and only after consultation with experts in the Rastafari religion. Defendant moves for summary judgment on the basis of qualified

immunity.  For the reasons set forth in the remainder of this Opinion,

Defendant's motion is granted.[1]

## BACKGROUND[2]

### A.     Factual Background

#### 1.     The Parties and the Religious Calendar

Plaintiffs Jason Powlette and Karvia Hamilton (together, "Plaintiffs") are a

---

[1]     Because all Defendants except Defendant Cheryl Morris have now been dismissed, the Clerk of Court is directed to amend the caption in the docket to conform to the caption in this Opinion.

[2]     The facts stated herein are drawn from the Second Amended Complaint ("SAC," Dkt. #50); the parties' submissions in connection with the instant motion, including Defendant's Local Rule 56.1 Statement ("Def. 56.1," Dkt. #84), and Plaintiffs' responses thereto ("Pl. 56.1 Opp.," Dkt. #90); Plaintiffs' Rule 56.1 Counterstatement ("Pl. 56.1," Dkt. #90), and Defendant's responses thereto ("Def 56.1 Opp.," Dkt. #95); the exhibits attached to the Declaration of Daniel Schulze ("Schulze Decl.," Dkt. #85); the exhibits attached to the Declaration of Brian S. Sokoloff ("Sokoloff Decl.," Dkt. #89); and the declarations submitted with the parties' papers (cited using the convention "[Name] Decl."). For convenience, Defendant's opening brief is referred to as "Def. Br." (Dkt. #86), Plaintiffs' opposition brief as "Pl. Opp." (Dkt. #91), and Defendant's reply brief as "Def. Reply" (Dkt. #94).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

A further word about the parties' submissions is in order: In connection with her motion, Defendant filed a 54-paragraph Rule 56.1 Statement. Plaintiffs responded with a 255-paragraph counterstatement, one which contravenes both letter and spirit of the Local Rule. *See* Local Rule 56.1(b) (permitting the non-moving party to respond to the statements of the moving party and to include "if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried"). To the extent that Plaintiffs have sought to create the appearance of a genuine issue of material fact by including a surfeit of counterstated facts, they have failed; the Court has reviewed each and every paragraph of their Rule 56.1 Counterstatement, and has found nothing that gives it pause in finding qualified immunity for Defendant Morris.

former and a current inmate, respectively, of DOCCS. (Def. 56.1 ¶¶ 1, 5). Plaintiffs are Rastafarians in the Church of Haile Selassie the First, a sect or "Mansion" of Rastafari founded by Abuna Foxe. (*Id.* at ¶¶ 2-3, 6).[3] From 1995 until April 2011, Foxe served as a chaplain for DOCCS. (*Id.* at ¶ 4; Pl. 56.1 Opp. ¶ 30).

Defendant Cheryl Morris has served since August 2010 as the Director of Ministerial, Family and Volunteer Services ("MFVS") for DOCCS. (Def. 56.1 ¶ 7). Each year, the Director of MFVS supervises the drafting and issuance of a "Religious Calendar" for the following year, which "sets forth specific accommodations to be provided to inmates who profess to be members of a recognized religion on particular dates that are generally considered to be holidays or holy days by followers of that religion." (*Id.* at ¶¶ 12-14). This document applies to all inmates incarcerated by DOCCS across all of its facilities. (Pl. 56.1 ¶¶ 74, 78). The Religious Calendar is prepared throughout the year and issued in November or December for the coming year, and it instructs, for instance, whether practicing inmates should receive special meals or should be excused entirely from work and programs on certain dates. (Def. 56.1 ¶¶ 15-17).

In considering the addition or removal of holidays listed on the Religious Calendar, MFVS considers both the importance of the holiday to inmates and the logistical and safety concerns in operating correctional facilities; during this

---

[3]     Plaintiff Powlette is also a "Levite," or a priest, within the sect. (Def. 56.1 ¶ 2).

process, they evaluate a number of factors, including (i) "the use of space for congregate services," particularly in smaller facilities; (ii) the "additional chaplain and security staffing that will be required" to facilitate congregate events; and (iii) the expense of and "advance ordering, storage, preparation and service of" special religious meals. (Def. 56.1 ¶¶ 19-20, 24, 26; *see also* Pl. 56.1 ¶¶ 112-16).

In addition, because inmates are assigned to work or programs, MFVS takes into account the need to obtain coverage for observant inmates' duties on holidays, and must obtain additional security staffing if, for instance, the Religious Calendar designation allows inmates to remain in their cells. (Def. 56.1 ¶¶ 21-23). Further, MFVS considers the "appearance" that it is "favoring one religious group over another," which "can foster animosity among inmates and against DOCCS staff," compromising safety at their facilities. (*Id.* at ¶ 29).

Because of these considerations, MFVS cannot include "every possible religious holiday" or "provide off-work, food and/or congregate service accommodations on every holiday." (Def. 56.1 ¶ 28). Thus, to compile the Religious Calendar, MFVS "consult[s] with experts on the many religions professed by DOCCS inmates in regard to what holidays are most important and what accommodations should ideally be provided to inmates for those holidays." (*Id.* at ¶ 18).

### 2.     Defendant's Consultation with Rastafari Experts

Defendant Morris is not, herself, an expert on Rastafari. (Def. 56.1 ¶ 51). From 1995 until April 2011, Abuna Foxe served as DOCCS's primary advisor

on Rastafari beliefs and practices.  (*Id.* at ¶ 31; Pl. 56.1 Opp. ¶ 31).  In drafting the Religious Calendars issued for 2011 and 2012, which drafting was undertaken while Foxe served as advisor, MFVS listed Negus Day, also called Nequest Day, as a Rastafari "high holy day," including special menu considerations and exemptions for observant inmates from scheduled work or programs.  (Def. 56.1 ¶ 32; Pl. 56.1 ¶¶ 87, 91; Schulze Decl. Ex. A, B).[4] Defendant does not recall receiving any complaints about the inclusion of Negus Day on the Religious Calendar during this time.  (Pl. 56.1 ¶ 92).

In the wake of disputes over work schedules and duties, Foxe and a number of other Rastafari chaplains retired or resigned in April 2011.  (Pl. 56.1 ¶¶ 130-32).[5]  Following Foxe's departure, Defendant sought a new Rastafari chaplain or expert to serve as a consultant; her counterpart in the Pennsylvania Department of Corrections recommended Rev. Dr. Noel Leo Erskine, a Professor of Theology and Ethics at the Candler School of Theology at Emory University.  (Def. 56.1 ¶¶ 9, 36-38; *see generally* Erskine Decl.).  Chaplain Leslie Carter, who worked under Defendant in MFVS, seconded this recommendation and contacted Dr. Erskine.  (Def. 56.1 ¶¶ 39-40).  Dr. Erskine

---

[4]    Negus Day recalls the date on which Emperor Haile Selassie the First was crowned King of Ethiopia and is observed on October 7 of each year.  (Pl. 56.1 ¶¶ 57, 60).

[5]    Plaintiffs note that Foxe filed a religious discrimination claim with the New York State Division of Human Rights (the "DHR"), which investigated his claim and found probable cause existed.  (Pl. 56.1 ¶¶ 133-35).  From this, Plaintiffs intimate that: (i) Defendant's alteration of the 2013 Religious Calendar was an extension of her "target[ing] and harass[ing]" of Rastafarian chaplains, and (ii) there is legal significance to the fact that Negus Day was restored to the calendar after the DHR's finding of probable cause in the Foxe claim.  (*See* Pl. Opp. 3).  A careful review of the record, however, makes clear that both arguments proceed from the logical fallacy of "*post hoc, ergo propter hoc.*"  In other words, there is no evidence, and only Plaintiffs' rank speculation, to support either contention.

specializes in "the history and development of the black church, specifically including the Rastafari faith," and he has written one book and several articles on the Rastafari faith.  (*Id.* at ¶¶ 10-11).  Dr. Erskine agreed to serve as an advisor (*id.* at ¶ 40), noting that he had previously "provided similar services to correctional officials in Georgia and Pennsylvania as well" (Erskine Decl. ¶ 3).

### 3. The 2012 Rastafari Training Session and the Preparation of the 2013 Religious Calendar

In early 2012, Deputy Commissioner Jeff McKoy[6] (Defendant's supervisor) and the National Institute for Corrections scheduled a training session for DOCCS chaplains and staff advisors, with Dr. Erskine, Dr. Marcia Stewart ("Queen Mother Moses" of the Rastafari faith), and Priest Christopher Cave ("Iras Levi," a priest in the Rastafari faith) presenting on Rastafari beliefs and practices.  (Def. 56.1 ¶¶ 41-42; Schulze Decl. Ex. N at 14).  After consultation with several "Rastafari leaders," including his two co-panelists, Dr. Erskine prepared a handout in advance listing 10 important dates in the Rastafari liturgical calendar.  The handout did not list Negus Day; Dr. Erskine believed, based on research and discussions with Rastafari colleagues, that "most Rastafarians do not attach particular significance to this date and do not celebrate it as a holiday."  (Def. 56.1 ¶¶ 42-44; Erskine Decl. ¶¶ 5-6).[7]

---

[6]     Deputy Commissioner McKoy oversees ministerial services and program services for all DOCCS facilities.  (Pl. 56.1 ¶¶ 246-47).

[7]     Dr. Stewart's deposition testimony does not clearly indicate whether she spoke to Dr. Erskine regarding the list of Rastafari holidays.  While she at one point testified that she was not consulted regarding the Religious Calendar at any point prior to being hired by DOCCS (Schulze Decl. Ex. N at 51), she later stated "[w]hen we were planning for our — the training and what we were going to include as content for the training, Rastafari holy days was a part of that discussion" (*id.* at 63).  She also indicated that she did not discuss the list of holidays with Dr. Erskine "*outside* of when [they] were

Noting that Dr. Erskine's handout did not match the Rastafari section of the 2012 Religious Calendar, Defendant became "concerned [that] this discrepancy indicated that the Rastafari portion of the Religious Calendar had been unfairly slanted towards the Mansion of Rastafari that had been founded by MFVS's former chaplain, Abuna Foxe," and that "holidays celebrated by inmates who belonged to other Mansions may have been omitted by Mr. Foxe." (Def. 56.1 ¶ 46). As a result, on June 8, 2012, Chaplain Carter sent Dr. Erskine an email, appending the 2012 Religious Calendar and citing Dr. Erskine's list of important dates, and stated:

> In the fall of each year we publish an annual religious calendar for use in our 66 correctional facilities. The information we gathered for our 2012 religious calendar was gather[ed] from a []former Rastafarian Chaplain (retired) and Rev. Cave. Some of the dates and events listed above are not currently listed in our 2012 calendar, but should be considered for future publications. So please note that we are open to further discussion and possible revisions at a later date.

(Schulze Decl. Ex. H; Def. 56.1 ¶ 47).

Dr. Erskine reviewed the calendar and conferred with his Rastafari colleagues. In the course of those discussions, he and his colleagues "agreed that the first and most important change we would recommend would be to replace Negus/Nequest Day, which, again, I did not understand to be a significant holiday for most Rastafari, with the Battle of Adwa Victory, a date of far more widespread celebration." (Erskine Decl. ¶ 9). Consequently, Dr.

---

planning the training for content purposes." (*Id.* at 92 (emphasis added)). In any event, Plaintiffs do not dispute Dr. Erskine's statement that he consulted Rastafari leaders in the Atlanta community on this subject.

Erskine responded by email dated June 11, 2012, as follows: "On the list you used last year we would suggest you delete Nequest Day and replace it with the Battle of Adwa Victory March 1.  This means we would have 4 holy days and the rest as holidays."  (Schulze Decl. Ex. H; Def. 56.1 ¶ 49).

Although Defendant did not have personal knowledge of the significance of these holidays, she addressed several of the penological interests outlined above — including in particular her concerns about favoritism among religions and potential inmate unrest — by removing Negus Day from the 2013 Religious Calendar and adding the Battle of Adwa Victory, in accordance with Dr. Erskine's recommendation.  (Def. 56.1 ¶¶ 50-51).  In addition to following Dr. Erskine's advice, Defendant determined not to keep both holidays on the Religious Calendar out of concern that this would give inmates the impression that DOCCS was showing preferential treatment to practitioners of the Rastafari faith.  (*Id.* at ¶ 52; Morris Decl. ¶ 32).  Defendant also indicated that she removed Negus Day and added the Battle of Adwa Victory in "a good faith effort to make all the Rastafarians inclusive in the group."  (Def. 56.1 Reply ¶ 143; Sokoloff Decl. Ex. 4 at 195).  On December 3, 2012, the 2013 Religious Calendar was issued, reflecting these changes.  (Def. 56.1 ¶ 50).

In May 2013, Plaintiff Powlette wrote to Paul Guenette, then-Assistant Director of MFVS under Defendant, complaining of the removal of Negus Day from the Religious Calendar, and explaining his belief in its significance.  (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 177; Sokoloff Decl. Ex. 16).  In August 2013, Powlette wrote to Defendant and Deputy Commissioner McKoy reiterating his complaints, and

8

in September 2013, he again wrote to Defendant.  (Pl. 56.1 ¶¶ 178-81; Sokoloff Decl. Ex. 17, 18).  Additionally, inmates, including Plaintiffs Powlette and Hamilton, filed grievances regarding the removal of Negus Day.  (Pl. 56.1 ¶¶ 216, 230-31).

### 4.    The Preparation of the 2014 Religious Calendar

The 2014 Religious Calendar again included the Battle of Adwa Victory and omitted Negus Day, but on April 15, 2014, Deputy Commissioner McKoy held a meeting to discuss inmate complaints regarding the absence of Negus Day.  (Pl. 56.1 ¶¶ 99, 248).  Deputy Commissioner McKoy told Defendant that "[b]ased on complaints and the pending litigation [in this Court], he just felt it would be the best decision to put [Negus Day] back on."  (*Id.* at ¶ 252).  As McKoy testified during his deposition, "as I recall, there were no compelling reasons when I listened to people to say that Negus Day had to be on the calendar," but he nonetheless "just made the call to put it back on."  (Sokoloff Decl. Ex. 5 at 66).  Thus, on June 25, 2014, DOCCS reinstated Negus Day for all inmates, and in July 2014, MFVS issued a Revised 2014 Religious Calendar, adding Negus Day and five other Rastafari holidays.  (Pl. 56.1 ¶¶ 101, 105; Sokoloff Decl. Ex. 14).[8]  The Battle of Adwa Victory holiday remains on the Calendar.

---

[8]    The additions were drawn from a list of Rastafari holidays drafted by Dr. Marcia Stewart, who was hired in January 2014 as DOCCS's statewide Rastafari chaplain; Defendant reviewed these with Dr. Erskine before incorporating them into the revised 2014 Religious Calendar.  (Pl. 56.1 ¶¶ 255-56; Schulze Decl. Ex. K; Schulze Decl. Ex. N at 11-12).

### B.      Procedural Background

On October 17, 2013, Plaintiffs, in addition to seven other individuals who have since withdrawn, filed their Complaint under 42 U.S.C. § 1983, as a class action against seven employees of DOCCS.  (Dkt. #4).[9]  On February 25, 2014, the Court granted an extension until March 27, 2014, for Plaintiffs to amend their Complaint (Dkt. #30), and Plaintiffs filed their Amended Complaint on that date (Dkt. #34).

On April 11, 2014, Defendants filed a pre-motion letter in anticipation of moving to dismiss the Amended Complaint.  (Dkt. #38).  Following the pre-motion conference, held on May 13, 2014, Plaintiffs were permitted to file a Second Amended Complaint on or before June 27, 2014.  (Dkt. #45).  Plaintiffs then filed their Second Amended Complaint on June 27, 2014.  (Dkt. #50).  On September 3, 2014, Defendants moved to dismiss the Second Amended Complaint (Dkt. #55-57); Plaintiffs filed their opposition on October 3, 2014 (Dkt. #58-59); and Defendants filed their reply papers on October 17, 2014 (Dkt. #60).

On July 10, 2015, the parties appeared for oral argument on the motion to dismiss; by oral decision, the Court granted the motion to dismiss as to Defendant Jeff McKoy.  (Dkt. #73).  In addition, Plaintiffs withdrew claims against Defendants Twymann, Smith-Roberts, and Gerbing.  (*Id.*).  Further, at that conference, the Court discussed contemplated summary judgment

---

[9]      Plaintiffs state, and Defendant does not dispute, that they administratively exhausted the claims prior to filing the lawsuit.  (*See* Pl. Opp. 5-6).

practice; in an Order dated July 17, 2015, the Court scheduled briefing on the issue of qualified immunity for the remaining two Defendants, Cheryl Morris and Paul Guenette.  (*Id.*).

On August 31, 2015, Defendants Morris and Guenette moved for summary judgment (Dkt. #80-86), and on October 16, 2015, Plaintiffs filed their opposition papers (Dkt. #89-91).[10]  On November 25, 2015, Defendants filed their reply papers (Dkt. #94), concluding the briefing on this motion.

## DISCUSSION

### A.    Applicable Law

### 1.    The Standard for Summary Judgment Motions

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could

---

[10]    In their opposition papers, Plaintiffs stated that they "withdraw all claims against defendant Guenette." (Pl. Opp. 1).  Defendant Guenette "only assumed his position in MFVS in June 2012, [and] had no personal involvement in the preparation of the Rastafari section of the 2013 Religious Calendar, or the decision to replace Negus Day with the Battle of Adwa Victory therein" (Def. Br. 20), and thus the Court need not consider qualified immunity as it applies to him.  Accordingly, all claims against Defendant Guenette are hereby dismissed.

return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Liberty Lobby, Inc.*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Liberty Lobby, Inc.*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d

12

159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

## 2.    The Standard for Qualified Immunity

"Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal citation omitted). Qualified immunity thus hinges on: "[i] whether plaintiff has shown facts making out a violation of a constitutional right; [ii] if so, whether that right was 'clearly established'; and [iii] even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez* v. *City of Schenectady*, 728

13

F.3d 149, 154 (2d Cir. 2013) (citing *Taravella* v. *Town of Wolcott*, 599 F.3d 129, 133-34 (2d Cir. 2010)).

For a constitutional right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson* v. *Creighton*, 483 U.S. 635, 640 (1987). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle* v. *Howards*, 132 S. Ct. 2088, 2093 (2012) (internal citation and quotation marks omitted).

"Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon* v. *Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Creighton*, 483 U.S. at 641). "The objective reasonableness test is met — and the defendant is entitled to immunity — if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)). Thus, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt* v. *Millender*, 132 S. Ct. 1235, 1244-45 (2012) (internal citation and quotation marks omitted).

14

**B.     Analysis**

   **1.     Defendant Is Entitled to Summary Judgment on Plaintiffs'
         First Amendment Claims Under the Free Exercise Clause and
         the Establishment Clause**

         **a.     Free Exercise Challenges in the Prison Context**

The Free Exercise Clause of the First Amendment guarantees the right to

free exercise of religion, and prisoners do not relinquish this right upon their

incarceration.  *See O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 348 (1987)

("Inmates clearly retain protections afforded by the First Amendment, including

its directive that no law shall prohibit the free exercise of religion." (internal

citations omitted)); *Ford* v. *McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003)

("Prisoners have long been understood to retain some measure of the

constitutional protection afforded by the First Amendment's Free Exercise

Clause.").

      Still, while prisoners retain their First Amendment rights, it is well-

established that a prisoner's right to exercise his religion "is not absolute or

unbridled, and is subject to valid penological concerns, including those related

to institutional security."  *Woodward* v. *Perez*, No. 12 Civ. 8671 (ER), 2014 WL

4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (internal quotation marks omitted);

*see also Salahuddin* v. *Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) ("A

prisoner's right to practice his religion is … not absolute.").  As a result, a

prisoner's free exercise claim is evaluated "under a reasonableness test less

restrictive than that ordinarily applied:  a regulation that burdens a protected

right passes constitutional muster if it reasonably related to legitimate

penological interests." *Salahuddin* v. *Goord*, 467 F.3d 263, 274 (2d Cir. 2006)
(quoting *O'Lone*, 482 U.S. at 349); *see also Vann* v. *Fischer*, No. 11 Civ. 1958
(KPF), 2014 WL 4188077, at *8-14 (S.D.N.Y. Aug. 25, 2014) (finding burdens
imposed on inmates wearing religious beads were reasonably related to
legitimate penological interest of inmate safety), *reconsideration denied*, No. 11
Civ. 1958 (KPF), 2015 WL 105792 (S.D.N.Y. Jan. 7, 2015).[11]

In pursuing a Free Exercise claim, an inmate "must show at the
threshold that the disputed conduct substantially burdens his religious
beliefs." *Salahuddin* v. *Goord*, 467 F.3d at 274-75.  "[A] substantial burden on
religious exercise exists when an individual is required to choose between
following the precepts of [his] religion and forfeiting benefits, on the one hand,

---

[11]    To determine the reasonableness of a proffered penological justification, the Supreme
Court and the Second Circuit have counseled as follows:

> Given the "difficult judgments" attendant to prison operation,
> *Turner* v. *Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64
> (1987), "a generally applicable policy" — even one that burdens an
> inmate's free exercise — "will not be held to violate a plaintiff's right
> to free exercise of religion if that policy 'is reasonably related to
> legitimate penological interests,'" *Redd* v. Wright, 597 F.3d 532,
> 536 (2d Cir. 2010) (quoting *O'Lone* v. *Estate of Shabazz*, 482 U.S.
> 342, 349, 107 S. Ct. 2400, 96 L.Ed.2d 282 (1987)). To make this
> determination, a court must consider:
>
>> whether the challenged regulation or official action
>> has a valid, rational connection to a legitimate
>> governmental objective; whether prisoners have
>> alternative means of exercising the burdened right;
>> the impact on guards, inmates, and prison
>> resources of accommodating the right; and the
>> existence of alternative means of facilitating exercise
>> of the right that have only a *de minimis* adverse
>> effect on valid penological interests.
>
> *Salahuddin* [v. *Goord*, 467 F.3d 263, 274 (2d Cir. 2006)] (footnote
> omitted) (citing *Turner*, 482 U.S. at 90-91, 107 S. Ct. 2254).

*Holland* v. *Goord*, 758 F.3d 215, 222-23 (2d Cir. 2014):

and abandoning one of the precepts of [his] religion … on the other hand." *Westchester Day Sch.* v. *Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) (citing *Sherbert* v. *Verner*, 374 U.S. 398, 404 (1963)).

"[T]he plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward*, 2014 WL 4276416, at *4 (internal quotation marks omitted).  "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin* v. *Goord*, 467 F.3d at 275 (internal citation and quotation marks omitted).

### b.    Establishment Clause Challenges in the Prison Context

Separately, in evaluating an Establishment Clause claim, courts within the Second Circuit apply the three-pronged analysis articulated by the Supreme Court in *Lemon* v. *Kurtzman*, 403 U.S. 602 (1971).  Under *Lemon*, in order to avoid impermissible conflict with the First Amendment, government action that interacts with religion (i) must have a secular purpose, (ii) must neither advance nor inhibit religion as its "principal or primary effect," and (iii) must not "foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-13 (internal quotation marks and citations omitted).

However, the *Lemon* test has been tempered within the prison context, pursuant to the test laid out by the Supreme Court in *Turner*.  As the Supreme Court there held, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to

legitimate penological interests." *Turner*, 482 U.S. at 89.  Thus, as with the

Free Exercise Clause, prison officials are permitted to "make [ ] difficult

judgments concerning institutional operations," as stricter scrutiny would

"seriously hamper their ability to anticipate security problems and to adopt

innovative solutions to the intractable problems of prison administration." *Id.*

Additionally, "in the prison context, the [E]stablishment [C]lause has been

interpreted in the light of the affirmative demands of the [F]ree [E]xercise

[C]lause." *Muhammad* v. *N.Y.C. Dep't of Corr.*, 904 F. Supp. 161, 168 (S.D.N.Y.

1995) (internal quotation marks omitted); *see also id.* ("In order to permit

inmates to freely exercise their religion, *some* entanglement is necessary."

(emphasis in original)); *see generally Ramrattan* v. *Fischer*, No. 13 Civ. 6890

(KPF), 2015 WL 3604242, at *7-8 (S.D.N.Y. June 9, 2015).

### c. Defendant Is Entitled to Qualified Immunity as to Plaintiffs' First Amendment Claims

Though the Court's July 17 Order focused the parties on the qualified

immunity issue, both sides have included some discussion of the merits of

Plaintiffs' claims, perhaps recognizing that one element of the qualified

immunity analysis is the demonstration of a violation of a constitutional right.

(*See, e.g.*, Def. Br. 13-18, 21-22, 23-24; Pl. Opp. 11-14, 16-17).  With regard to

Plaintiffs' Free Exercise claim, Defendant accepts, for purposes of argument,

that the replacement of Negus Day, "resulting in plaintiffs not being excused

from all work and programs and not receiving a special religious meal on Negus

Day in 2013, constituted a substantial burden on plaintiffs' sincerely held

18

religious belief." (Def. Br. 13).  As the Second Circuit has held, it is "clearly established," for qualified immunity purposes, "that prison officials may not substantially burden inmates' right to religious exercise without some justification." *Salahuddin* v. *Goord*, 467 F.3d at 175-76.  However, Defendant argues, she is nonetheless entitled to summary judgment on grounds of qualified immunity "because plaintiffs cannot demonstrate that the penological interests underlying the change to the 2013 Religious Calendar were irrational," and "reasonable officials in [her] position could have believed that the actions [she] took did not violate the Constitution." (Def. Br. 14).

In opposition, Plaintiffs assert that Defendant violated their First Amendment rights under the Free Exercise Clause by removing Negus Day from the 2013 and 2014 Religious Calendars without any legitimate penological interest. (SAC ¶¶ 90-92, 96-97).[12]  Plaintiffs contend that Defendant's alteration of the Religious Calendar "defie[d] rationality" and, thus, she is not entitled to qualified immunity. (Pl. Opp. 11).  Separately, Plaintiffs contend that qualified immunity is not warranted because Defendant relied on an expert without also inquiring into the inmates' sincerely held religious beliefs. (*Id.* at 12).

---

[12]    In the opening sentence of their opposition papers, Plaintiffs state, "Defendant Cheryl Morris, a DOCCS official, does not deserve qualified immunity for her irrational and illegal decision to remove Negus Day, a significant Rastafarian holy day, from the DOCCS' Religious Calendar in 2013." (Pl. Opp. 1 (footnote omitted)).  Given this statement and the fact that Plaintiffs were indeed permitted to observe Negus Day in 2014, the Court understands Plaintiffs' claims to be limited to its 2013 removal from the Religious Calendar.

The Court will begin where the parties have focused their attention, namely, whether Defendant had a legitimate penological interest in modifying the 2013 Religious Calendar.  As Defendant has explained, DOCCS — and MFVS within it — must "address the needs of many different inmate religious groups," taking into account meeting space allocation, additional security and staffing, food accommodations, and other factors for each inmate holy event. (Morris Decl. ¶ 3).  The costs, considerations, and accommodations for each potential holiday "create[] substantial, albeit not insurmountable, security, budgetary and administrative burdens on DOCCS." (*Id.* at ¶ 6).  For instance, if DOCCS permits observant inmates to abstain from assigned work or programs, they must coordinate coverage for those inmates' duties, in addition to obtaining additional security personnel if, for example, inmates are permitted to remain in their cells in observance of that holiday.  (*Id.* at ¶¶ 7-8).  Similarly, DOCCS may need to arrange for specialized food, at extra cost, or meeting spaces for large congregate services.  (*Id.* at ¶¶ 9-10).  These logistical, security, and expense-related considerations thus "make it effectively impossible for DOCCS to list every potential religious holiday on its Religious Calendar." (*Id.* at ¶ 12).

Moreover, DOCCS must take care "not to prefer one inmate religious group over another and to avoid any appearance that it is doing so," for reasons of fairness, constitutional concerns, and the potential for resultant animosity among inmates of different religions, which can "compromise [ ]

safety and security." (Morris Decl. ¶ 13).  As Defendant's supervisor, Jeff

McKoy, testified:

> Typically what happens is inmates say, [l]ook what they
> got; [w]hy can't I have it?  So if you're adding more holy
> days to a group, even if they are legitimate and we
> should be doing it for a good religious reason and First
> Amendment reason, there's always the chance that
> another group is going to say, [t]hey're getting more; [w]e
> want more too.  Then it becomes what's going to be the
> straw that's gonna break the camel's back, and we can't
> do this anymore simply because of resources.  That was
> the typical conversation we had … if the religious
> authority is telling you it's a necessity, that's kind of
> where, generally, you're supposed to go.

(Sokoloff Decl. Ex. 6 at 88).

Of course, the real battle between the parties is not whether DOCCS and

Defendant had a legitimate penological interest, but rather whether the manner

chosen to implement that interest amounted to a violation of Plaintiffs' First

Amendment rights.  The difficulty with the parties' arguments is that, to a

degree, they conflate the issues of the rationality of Defendant's conduct (which

goes to the issue of whether there was a constitutional violation) and the

objective reasonableness of her conduct (which goes to the issue of whether

there is qualified immunity).  The Court, however, has directed the parties to

focus on the issue of qualified immunity.  For purposes of the qualified

immunity analysis, the Court will presume that Plaintiffs have articulated a

violation of their First Amendment Free Exercise rights, though a very strong

argument can be made that Plaintiffs have failed to demonstrate the

irrationality of Defendant's proffered penological interest.  The remaining issue,

then, is whether it was objectively reasonable for Defendant to act as she did —

or, as Defendant herself posits, "Could a reasonable official in the position of defendant Cheryl Morris possibly have believed that she was not violating the Constitution when, following the advice of her expert in the Rastafari religion, Professor Erskine, she replaced the Rastafari holiday of Negus Day with the Battle of Adwa Victory in the 2013 DOCCS Religious Calendar?" (Def. Reply 3). The answer to this question is a resounding yes.

In the wake of Abuna Foxe's departure from DOCCS, Defendant — concededly not an expert on Rastafari beliefs or practices — sought the assistance of a more knowledgeable source, Dr. Erskine, in preparation for a training on Rastafari beliefs and practices for DOCCS employees. (Morris Decl. ¶ 20). As part of this, Dr. Erskine reviewed MFVS's 2012 Religious Calendar with the assistance of several leaders in the Rastafari community and stated, "[o]n the list you used last year we would suggest you delete Nequest Day and replace it with the Battle of Adwa Victory March 1." (Schulze Decl. Ex. I). Separately, as a result of training on Rastafari conducted by Dr. Erskine, Marcia Stewart, and Dr. Cave, Defendant obtained "a better understanding of the many Mansions of Rastafari and just how different each Mansion's beliefs and practices could be from the other Mansions of Rastafari." (Morris Decl. ¶ 30). This training, coupled with the communications received from Dr. Erskine, intensified pre-existing concerns on Defendant's part "that Mr. Foxe had been proselytizing for the Mansion of which he was considered the leader, rather than ministering to the needs of the Rastafari inmates who did not share the beliefs and practices of his Mansion." (*Id.*). As McKoy also testified,

22

Chaplain Foxe was "very controversial," and "many inmates [ ] did not attend his services" because "[t]hey felt that he did not represent them." (Sokoloff Decl. Ex. 5 at 37, 42).

To implement the above-described penological interests, which included fostering religious inclusiveness while reducing the possibility of inmate dissension concerning religious observances, Defendant removed Negus Day from the 2013 Religious Calendar and replaced it with the Battle of Adwa Victory. (Morris Decl. ¶ 32). Defendant indicates that she made this change, rather than listing both Negus Day and the Battle of Adwa Victory, as "that was what Professor Erskine had recommended, and because I was concerned that adding another Rastafari holiday while also retaining Negus Day would leave the impression that DOCCS was giving preferential treatment to practitioners of the Rastafari religion, and, in particular, the members of Mr. Foxe's specific Rastafari Mansion." (*Id.*).

Whether construed as attacks on the "rationality" or the "objective reasonableness" of Defendant's actions, Plaintiffs' arguments fail. Plaintiffs principally argue that "[g]iven the undisputed — and indisputable — evidence showing plaintiffs and other Rastafarian inmates ... had a sincerely held religious belief in the meaning of Negus Day, defendant Morris' action of arbitrarily removing the holy day because Dr. Erskine told her the holiday had no significance does not amount to a rational penological interest." (Pl. Opp. 12). However, Plaintiffs have not shown that it was objectively

unreasonable for Defendant to believe her conduct was lawful, as is the standard for qualified immunity.

More to the point, Plaintiffs fundamentally misperceive Defendant's arguments: Defendant *concedes* Plaintiffs' sincerely held religious beliefs (Def. Br. 13-14), but argues that broader penological concerns about maintaining order across a diverse prison population caused her to alter the 2013 calendar. Plaintiffs' sincerely held belief, standing alone, cannot render Defendant's decision to remove Negus Day objectively unreasonable.  That is because the "rational penological interest" Defendant cites as supporting her decision was not Dr. Erskine's recommendation; rather, the interests included (i) the administrative burdens attendant to accommodating any religious holiday in a prison setting, as well as (ii) Defendant's concerns about potential appearances of favoritism toward Foxe's Mansion of Rastafari, and of favoritism toward all Rastafari if the group were given an additional holiday.  (*Id.* at 14-15).  Dr. Erskine simply provided objectively reasonable information that Defendant used in promoting that interest.

Defendant's concern was not arbitrary or unfounded, given that a court within this Circuit has recognized this precise issue:  In a separate matter, Magistrate Judge Debra Freeman accepted the plaintiff's assertion that:

> [I]n the past, [DOCCS] promoted the tenets of one Rastafari mansion — the Ba Beta Kristiyan Church of Haile Selassie ("Ba Beta Kristiyan Church") — over the tenets of any others … Plaintiff's contention in this regard is not seriously in dispute in this case.  In several respects, Defendants have conceded the accuracy of Plaintiff's contention about the insular views of DOCCS'

>       prior Rastafari chaplain [Abuna Foxe], and the
>       exclusionary practices that resulted.

*Rossi* v. *Fischer*, No. 13 Civ. 3167 (PKC) (DF), 2014 WL 5778702, at *5
(S.D.N.Y. Sept. 11, 2014), *report and recommendation adopted*, No. 13 Civ.
3167 (PKC) (DF), 2014 WL 5786901 (S.D.N.Y. Nov. 5, 2014).  This Court in no
way suggests Defendant relied upon this judicial determination, as it clearly
postdates the action at issue.  However, the perceived favoritism referenced
therein lends credence to the concerns that animated Defendant's legitimate
penological interest, and confirms that her conduct was objectively reasonable.

In faulting Defendant for consulting with an outside expert while not
inquiring into inmates' sincerely held beliefs, Plaintiffs rely on *Ford* v. *McGinnis*,
352 F.3d 582 (2d Cir. 2003), and *Jackson* v. *Mann*, 196 F.3d 316 (2d Cir.
1999).  As the preceding analysis makes plain, this reliance on cases
concerning only the evaluation of an inmate's sincerely held religious beliefs is
misplaced.  In *Ford*, the Second Circuit held that corrections employees were
not entitled to qualified immunity where they relied on religious experts in
determining that a Muslim holiday was without religious significance to an
inmate; instead, "the proper inquiry was always whether [the inmate's] belief
was sincerely held and '*in his own scheme of things*, religious.'"  352 F.3d at
597-98 (citing *Patrick* v. *LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) (emphasis
in original)).  Similarly, in *Jackson*, prison officials were not entitled to qualified
immunity where they relied on a rabbi's advice that an inmate was not truly
Jewish and, therefore, not entitled to Kosher food.  196 F.3d at 320.  In both

cases, the inquiry was the inmate's personal sincerity of belief. *Id.* Here, where Defendant has *conceded* Plaintiffs' sincerely held beliefs were burdened, thus satisfying the first prong of a Free Exercise violation, the Court need not inquire into that issue further. Rather, the Court must evaluate whether it was objectively reasonable for Defendant to believe her conduct in modifying the 2013 Religious Calendar was nonetheless lawful, in that it satisfied a legitimate penological interest.

On that point, Plaintiffs state that the "undisputed evidence shows Morris cherry-picked an outside consultant who would tell her to remove Negus Day from the calendar," and she "never consulted Dr. Stewart, even though [Stewart] trained DOCCS' ministerial staff on the Rastafarian religion and defendant Morris later hired her as the statewide chaplain." (Pl. Opp. 12-13). Regardless of any prior disputes between Defendant and Abuna Foxe, the Court puts no stock in the assertion that Defendant intentionally selected an advisor whose views diverged from Foxe's. Plaintiffs have presented no evidence substantiating this; on the contrary, Defendant has stated that her consultation with her counterpart in an entirely separate correctional system led her to seek out Dr. Erskine. (*See* Morris Decl. ¶ 17).

Similarly, Defendant was not required to exhaust every avenue of Rastafari belief before removing Negus Day; rather, qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt*, 132 S. Ct. at 1244-45. The Court

cannot find that Defendant was "plainly incompetent" in relying on Dr. Erskine and the Rastafari leaders with whom he consulted, and failing to seek the advice of Dr. Stewart, who was not even employed by DOCCS at the time Defendant made this decision.

Separately, Plaintiffs point out that "removing Negus Day did not improve conditions for Rastafarians," but instead "created discontent among Rastafarian inmates." (Pl. Opp. 13). Assuming this assertion to be factually accurate, it speaks only to the "reasonable but mistaken" decisions that officials may make without ceding qualified immunity. *See Messerschmidt*, 132 S. Ct. at 1244-45. As the Supreme Court has held, prison administrators may make judgments on "difficult and sensitive matters of institutional administration" where "special arrangements for one group [will] create problems as other inmates see that a certain segment is escaping a rigorous work detail and perceive favoritism ... [which] would have undesirable results in the institution." *O'Lone*, 482 U.S. at 353 (internal quotation marks and citations omitted). In this vein, the Court finds that it was objectively reasonable for Defendant to believe that the removal of Negus Day and addition of the Battle of Adwa Victory would render the Religious Calendar more even-handed among the varying Mansions of Rastafari, without creating perceptions of favoritism for Rastafari across other religious groups.

And while Plaintiffs argue that "[n]o reasonable official would have ignored repeated letters and grievances from Rastafarian inmates educating [her] about the religious significance of Negus Day and asking her to restore it

27

to the calendar" (Pl. Opp. 14), this again does not render Defendant's judgment "at the time of the challenged act" irrational. *Lennon*, 66 F.3d at 420.  In any event, responses from Defendant and others in MFVS to these complaints explained that the change was made "in consultation with a Rastafarian religious authority" and that:

> Historically, the calendar primarily reflected Rastafarian holy days that were associated with one sect/mansion of the faith.  The 2013 change was made in an effort to attempt to acknowledge holy days that are celebrated by the various sects/mansions of the Rastafarian faith.  Even though Nequest Day was removed from the Religious Calendar, it has been replaced with the Battle of Adwa.

(Sokoloff Decl. Ex. 19; *see also id.* at Ex. 15, 20, 24, 25).  The rationale articulated in these responses only supports Defendant's ostensible reliance on Dr. Erskine's advice in addressing her penological concerns, rather than suggesting that she deliberately and irrationally deprived Plaintiffs of an important holiday.

Finally, Plaintiffs state that the restoration of Negus Day to the 2014 Religious Calendar "demonstrates … how its 2013 removal was irrational."  (Pl. Opp. 15).  Such "Monday-morning quarterbacking" is, of course, the very antithesis of the qualified immunity analysis.  The Court finds that, based on the advice received from Dr. Erskine and his colleagues, "officers of reasonable competence could disagree" on the propriety of adjusting the Rastafari holy days on the Religious Calendar in 2013 in an effort to dispel the perception (if not the actuality) of favoritism, and thus, Defendant's action was not objectively unreasonable.  *Malley*, 475 U.S. at 341.  For all of the above

reasons, Defendant is entitled to qualified immunity on Plaintiffs' Free Exercise claim.

For similar reasons, summary judgment is granted as to Plaintiffs' Establishment Clause claim.  In evaluating this claim, courts should look "to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances confronting a defendant, would have understood that his actions were unlawful." *Hanrahan* v. *Doling*, 331 F.3d 93, 98 (2d Cir. 2003) (internal quotation marks omitted).

As the Second Circuit has previously stated with regard to the Establishment Clause, "we note that the prohibition of official discrimination against religions is undoubtedly 'clearly established.'" *Cox* v. *Miller*, 296 F.3d 89, 101 (2d Cir. 2002); *see also Larson* v. *Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").  However, even assuming Defendant's conduct violated this "clearly established" constitutional right, Defendant nonetheless has demonstrated that her action "could reasonably have been thought consistent with the rights [she is] alleged to have violated." *Creighton*, 483 U.S. at 638-39.  Plainly, Defendant consulted a recommended expert in an effort to rectify — and to prevent going forward — any impressions of DOCCS's preference for one Mansion of Rastafari over any other, or any notion of preferential treatment of Rastafarians over adherents of other religions.

As discussed above, courts show prison officials deference in their decisions balancing administrative costs and concerns with inmates' constitutional rights, especially as "few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Turner*, 482 U.S. at 90. "[E]ven where claims are made under the First Amendment," a court should not "substitute [its] judgment on ... difficult and sensitive matters of institutional administration, for the determinations of those charged with the formidable task of running a prison." *O'Lone*, 482 U.S. at 353 (internal citation omitted); *cf. Gilmore-Bey* v. *Coughlin*, 929 F. Supp. 146, 153 (S.D.N.Y. 1996) ("The DOC system's actions reflect a permissible purpose, i.e., providing religious accommodations to the inmates in its custody while operating within difficult economic and security constraints." (internal citations and quotation marks omitted)).

Because the Court finds that Defendant has proffered adequate explanations of (i) the administrative, financial, and security-related burdens facing DOCCS, and (ii) her belief, based on communications with Dr. Erskine and the Rastafari training session, that the prior Religious Calendars had been unfairly slanted toward one particular Mansion of Rastafari, the Court finds that it was objectively reasonable for Defendant to believe that her conduct did not violate Plaintiffs' rights under the Establishment Clause, and thus she is entitled to qualified immunity on that claim.

30

**2.   Defendant Is Entitled to Summary Judgment as to Plaintiffs' Equal Protection Claim**

**a.   Equal Protection Challenges in the Prison Context**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  As the Supreme Court has explained, this amounts to "a direction that all persons similarly situated should be treated alike." *City of Cleburne* v. *Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  To claim that a government policy violates the Equal Protection Clause, "claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano* v. *Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (internal citations omitted).

The Second Circuit has held that the *Turner* standard, while "established in the context of [F]irst [A]mendment issues," is similarly applicable to Equal Protection claims for prisoners.  *Benjamin* v. *Coughlin*, 905 F.2d 571, 575 (2d Cir. 1990); *see also Pugh* v. *Goord*, 571 F. Supp. 2d 477, 502 (S.D.N.Y. 2008).  "As to such claims, the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests," and courts must look to whether the "groups are so similar that discretion has been abused." *Benjamin*, 905 F.2d at 575 (internal citation and quotation marks omitted).  "Thus, even if plaintiffs can demonstrate that two groups are similarly situated, disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate

31

penological interests.'" *Pugh*, 571 F. Supp. 2d at 502 (quoting *Benjamin*, 905 F.2d at 574).

### b.   Analysis

Plaintiffs contend that Defendant is not entitled to qualified immunity for their Equal Protection claim, as "no other religious group faced [Defendant's] bizarre and illogical attempt to make the religious calendar more *inclusive* (or 'global') by *removing* a holy day sacred to some from the calendar." (Pl. Opp. 16 (emphases in original)). As they argue, Defendant "must show she took the same action toward Rastafarians as she did toward other religious groups," and while she removed Negus Day from the 2013 Religious Calendar for Rastafarians "with no legitimate penological interest," she "produced no records showing she arbitrarily removed a holiday from any other religious group or that complaints from any other group fell on deaf ears." (*Id.* at 16-17). Plaintiffs' claim, however, is circular. As Defendant correctly points out, in contrast to Plaintiffs' characterization of the burden, Defendant "hardly needs to prove that she is irrational and malicious to prevail." (Def. Reply 7).

At base, Plaintiffs contend that they were forced to cede an important holiday from their Religious Calendar while inmates of other faiths were not. While in no way seeking to minimize the significance to Plaintiffs of their faith and their ability to practice that faith while imprisoned, their efforts to shoehorn their claim into an Equal Protection framework fail. First, Plaintiffs' equal protection theory is refuted by the testimony of McKoy, Defendant's supervisor, that there were "typical conversation[s]" about balancing holidays

among the various religious groups.  (Sokoloff Decl. Ex. 6 at 88).  Thus, even if Plaintiffs were considered to be "similarly situated" to other religious groups, they have not clearly shown that they alone faced changes to the representation of their holidays on the Religious Calendar.

Further, while Plaintiffs characterize Defendant's revision of holidays as an "illogical" attempt to make Rastafari more global by *removing* a holiday (Pl. Opp. 16), they omit the key fact that Defendant indeed *added* a separate holiday, the Battle of Adwa Victory, based on her understanding that it was more widely observed.  The Court again finds that Defendant could reasonably believe her action was lawful, and Plaintiffs' insinuation that Defendant deleted a holiday from their list of accommodations for no reason other than a discriminatory animus is thus specious at best.  In short, even if Plaintiffs had identified an equal protection violation, Defendant has again demonstrated her entitlement to qualified immunity.

## CONCLUSION

No party to this litigation — including the Court — disputes that Negus Day is an important day for Plaintiffs, or that Plaintiffs' sincerely-held beliefs were burdened by the removal of this holiday from the 2013 Religious Calendar.  However, as discussed in detail above, Defendant has demonstrated that it was objectively reasonable for her to believe, based on all of the information that she had sought and obtained, that it was lawful for her to address legitimate penological interests by removing Negus Day and adding the Battle of Adwa Victory to the 2013 Religious Calendar.  And on this record, no

reasonable jury could conclude otherwise.  As a result, Defendant is entitled to qualified immunity, and Plaintiffs' Free Exercise, Establishment Clause, and Equal Protection claims must fail.

        For the reasons discussed herein, Defendant's summary judgment motion is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

        SO ORDERED.

Dated:        May 23, 2016
              New York, New York

                                        _____
                                            KATHERINE POLK FAILLA
                                            United States District Judge

34